Maria ALANIZ et al., Plaintiffs,

v.

CALIFORNIA PROCESSORS, INC.,
Walnut Creek, California, et al.,
Defendants.

No. C–73–2153 WHO.

United States District Court,
N. D. California.

May 5, 1976.

Vilma S. Martinez, Sanford Jay Rosen, Drucilla S. Ramey, Mexican American Legal Defense and Educational Fund, Alan Exelrod, Michael A. Mendelson, Exelrod & Mendelson, San Francisco, Cal., for plaintiffs.

Robert M. Lieber, Littler, Mendelson & Fastiff, San Francisco, Cal., for Cal. Processors, Inc., Contadina Foods, Davis Cannery, Tri-Valley Growers Plants Nos. 1, 2 and 7.

Donald D. Connors, Jr., Brobeck, Phleger & Harrison, San Francisco, Cal., for Tillie Lewis Foods, Inc.

Richard M. Bryan, Farella, Braun & Martel, San Francisco, Cal., for Hunt-Wesson Cannery.

Jay W. Luther, Chickering & Gregory, San Francisco, Cal., for Joan of Arc Cannery.

Jonathan H. Sakol, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for Cal. Canners & Growers.

Donald S. Tayer, Neil Bodine, Brundage, Neyhart, Beeson & Tayer, San Francisco, Cal., for defendant Unions.

Gary R. Siniscalco, EEOC Regional Office, San Francisco, Cal., for EEOC.

Martin Fassler, Gaenslen & Fassler, San Francisco, Cal., Charles E. Farnsworth, Farnsworth, Denison & Saperstein, Oakland, Cal., Clifford C. Sweet, Amanda Hawes, Frank Roesch, Legal Aid Society of Alameda County, Union City, Cal., James Gonzalez, Contra Costa Legal Services Foundation, Pittsburg, Cal., Theodore G. Smith, Smith, Johnson, Fogel & Ramo, San Jose, Cal., Rodrigo Mayorga, Sacramento, Cal., William H. Carder, San Francisco,

Cal., for intervenors and applicants for intervention.

## OPINION

ORRICK, District Judge.

De Tocqueville, almost one hundred fifty years ago, in his celebrated comment, said "Scarcely any political question arises in the United States that is not resolved, sooner or later, into a judicial question".[1] Today, any economic and/or social question becomes a political question and almost invariably is resolved into a judicial question. De Tocqueville's oft-quoted observation could scarcely be better illuminated than by an exposition of the facts of this case.

Here, the Court, without expertise of its own, is called upon to approve as fair, reasonable, and adequate a Conciliation and Settlement Agreement (the Agreement) affecting working conditions of thousands of workers in 74 canneries and food processing facilities throughout Northern California. The Court is required to sit, in effect, as a labor arbitrator. The purpose of this Opinion is not only to discuss the reasons for finding the Agreement fair, reasonable, and adequate and for certifying a class of 150,-000, but also to illuminate the procedure followed in the hope that it may assist other district judges faced with the same task.

## I. THE LITIGATION

Plaintiffs, representing a class of female and minority cannery workers, bring this action pursuant to Title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e, et seq.) and the Civil Rights Act of 1866 (42 U.S.C. § 1981) seeking relief from the defendants' allegedly unlawful employment practices. In essence, the amended complaint charges that the defendants, the employers and unions of some 74 food processing and canning plants in Northern California and their industry-wide collective bargaining agents, discriminated against the plaintiffs and the plaintiff class by denying females and minority group members opportunities to obtain higher-paying and

year-round positions within the canning industry.

The principal issues presently before the Court are whether to certify a class and whether to approve a settlement reached between the parties to this litigation. The proposed settlement sets forth a comprehensive, industry-wide, five-year plan to remedy the effects of past discrimination against the affected class and to prevent future discrimination in the canning industry in Northern California. The settlement calls for the restructuring of seniority, job bidding, and job training provisions of the collective bargaining agreement which governs wages, terms, and conditions of employment in the industry. The proposed settlement also establishes hiring preferences and goals to insure that the basic objective of opening up higher-paying and year-round positions for females and minorities is achieved. It further provides for some $5 million in monetary relief to compensate the victims of past discrimination as well as to pay for future affirmative action obligations. For the reasons hereinafter set forth, the Court finds that the proposed settlement is fair, reasonable, and adequate and should be approved. Further, the Court certifies an industry-wide class consisting of all present, past future, and potential bargaining unit employees and applicants for employment of member companies of California Processors, Inc. (CPI) who are Blacks, Asian-Americans, Native Americans, Spanish-surnamed Americans, or females.

The complaint in this action was originally filed on December 3, 1973, and was subsequently amended on February 21, 1975. Of the 14 named plaintiffs, 12 are employees, former employees, or rejected applicants for employment of one or more of 9 defendant canneries in the greater Modesto, California area. These same 12 plaintiffs are also members or former members of the defendant Cannery Warehousemen Food Processors, Drivers and Helpers, Local 748 (Local 748). The named plaintiffs include 5

---

1. De Tocqueville, *Democracy in America* 280 (1956 ed.).

women, 10 Spanish-surnamed Americans, and one Native American. Also named as defendants in the amended complaint are over 60 additional canneries and allied operations whose food processing and canning plants are located in Northern California and 12 other local unions which represent employees at the plants of the defendant employers. The amended complaint further names as defendants the California State Council of Cannery and Food Processing Unions, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America (State Council) and CPI. The State Council serves as the authorized collective bargaining agent for the 13 local unions which represent employees in the canning industry. CPI is the authorized collective bargaining agent for 29 companies which operate some 70 canning facilities in Northern California.

All the defendant employers and local unions operate under the terms of an industry-wide collective bargaining agreement negotiated by the State Council and CPI. The collective bargaining agreement in force at the time this complaint was filed is dated July 26, 1973.

The amended complaint in this action seeks declaratory and injunctive relief with respect to alleged discriminatory employment practices throughout the industry encompassed by the collective bargaining agreement. During the pendency of this private action, the defendants were also engaged in a conciliation process with the Equal Employment Opportunity Commission (EEOC). The conciliation process with the EEOC addressed substantially the same alleged discriminatory activity as this private action.

In 1974 the plaintiffs in this action were invited by the defendants to join the conciliation negotiations being conducted with the EEOC. Those combined negotiations culminated on February 19, 1975, when the parties and the EEOC entered into the Agreement. It is the Agreement which became the subject of the Court proceedings to determine its adequacy as a settlement agreement and consent decree with respect to the private class action.

On June 20, 1975, all the parties to the Agreement filed it with the Court and requested, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, that notice of the proposed settlement be sent to the settlement class.

On April 28, 1975, and again on June 13, 1975, separate groups of individuals, members of the purported class, filed motions to intervene in the instant suit, contesting various aspects of the Agreement and challenging its overall adequacy.[2]

## II. PROCEDURE FOLLOWED IN EVALUATING THE AGREEMENT

Upon order of the Court, the matter proceeded pursuant to Section 1.46 of the Manual for Complex Litigation (the Manual). This section sets out suggested criteria and procedures for approving settlements in class actions. The Manual calls for a two-step procedure to determine whether a proposed settlement is fair and reasonable. The first step is a preliminary determination as to whether notice of the proposed settlement should be given to members of the class and a hearing scheduled at which evidence in support of and in opposition to the proposed settlement will be received. Before ordering that notice be sent out, the trial judge must be satisfied that the proposed settlement is within the range of possible approval. In essence, this determination is similar to a determination that there is "probable cause" to think the settlement is fair and reasonable.

To make this determination the Court called for briefs and affidavits from counsel for the Proponents and counsel for the Intervenors addressing the ultimate question whether the Agreement is fair and reasonable. After finally considering all briefs and

---

**2.** The motions to intervene were continued pending the outcome of the proceedings on the adequacy of the proposed settlement in this case. The Applicants for Intervention (Intervenors) were granted rights to fully participate in these proceedings.

affidavits and after hearing extended oral argument, the Court held the Agreement embodying the proposed settlement was within the range of possible approval. The Court then ordered notice to be prepared and sent to a tentative class for the purposes of settlement consisting of "all present, past, future and potential [bargaining unit] employees and applicants of the [defendant employers] who are Blacks, Asian-Americans, Native-Americans, Spanish-surnamed Americans or females".

The Court then reviewed the content of the notice and procedures by which it was to be communicated to the class and found that the notice was fully adequate for purposes of the Rule 23(e) hearing, and that it was notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections". *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

A "Notice of Pendency of Class Action and Proposed Settlement", in both English and Spanish, was mailed to over 150,000 individuals who had been employed at any of the defendant canneries since January 1, 1970. Other measures, including newspaper publication and posting at the plants of the defendants, were undertaken to insure adequate notice to the potential class.

In preparation for the hearing on the merits of the Agreement called for by Rule 23(e) of the Federal Rules of Civil Procedure and the second step of the two-step procedure called for by Section 1.46 of the Manual, the Court permitted the Intervenors, solely for the purpose of participating in the second hearing, to enter the litigation and introduce all such evidence, oral and documentary, as they could muster after full discovery under the Rules against approving the Agreement. The Court also permitted potential class members to make statements before the Magistrate urging approval or rejection of the Agreement. Approximately 30 of them took advantage of this opportunity.

Under Rule 706 of the Federal Rules of Evidence, the Court then appointed two impartial expert witnesses, Messrs. Sam and John Kagel. The experts received all pleadings, briefs, affidavits and other documents filed by the parties and consulted extensively with the Proponents and Intervenors.

Finally, the Court conducted six days of hearings during which evidence, both oral and documentary, was introduced. Experts on various phases of the Agreement testified for both sides. The issues were thoroughly litigated and hotly contested. Before the hearings closed, Mr. Sam Kagel, one of the court-appointed experts, testified under direct examination by the Court. Both Proponents and Intervenors then had an opportunity to cross-examine him. Further oral argument ensued, and proposed findings of fact and conclusions of law (although not required) were submitted by the parties to point out their differences after the evidence had been taken.

The Agreement, by stipulation, was amended a number of times before and during the hearings. This was done in large part by a combination of the unremitting assault of the Intervenors on certain parts of the Agreement and the statesmanlike approach of the Proponents in reasonably dealing with the Intervenors' objections.

As a result, the Agreement in its present form is far more palatable to the Court than the one considered at the first hearing. For the reasons discussed *infra*, I now certify the class, approve the Agreement as fair, reasonable, and adequate, and deny the motions of the Intervenors to intervene in this action.

### III.  CERTIFICATION OF THE CLASS

Initially, the Court must determine that this action should appropriately be maintained as a class action under the requirements of Rule 23 of the Federal Rules of Civil Procedure.

As noted, this Court previously permitted notice of the proposed Agreement to be distributed to potential class members. The

Court also designated a tentative class for the purpose of a settlement comprised of all present, past, future, and potential employees and applicants for employment of member companies of California Processors, Inc. who are Black, Asian-Americans, Native Americans, Spanish-surnamed Americans, or females. The Court now finds and determines that this proposed class, as more fully defined in the Court's "Notice of Pendency of Class Action and Proposed Settlement", meets the requirements of Rule 23 in that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law and fact common to the class, (3) the claims of the representative parties are typical of the claims of the class, and (4) the representative parties fairly and adequately protect the interests of the class.

Numerosity is no problem here since the tentative class, those to whom notice was sent, is in excess of 150,000 persons. The Court finds that the claims of the 14 named class representatives present common questions of law and fact. It is important to note in this regard that the cannery industry whose employment practices are subject to this suit has operated since the 1930's under an industry-wide collective bargaining agreement, which includes uniform seniority and job bidding procedures, industry-wide job classifications and pay rates, standard job descriptions for all plants, and a single, industry-wide grievance procedure. The claims of the named plaintiffs are that employment practices under the collective bargaining agreement and the industry-wide policies adopted by the defendant canneries and unions, and their industry-wide bargaining agents, operate in a discriminatory manner. The Agreement will modify, alter, and supplement the collective bargaining agreement.

■ An action such as this, where the plaintiffs bring an across-the-board attack on the allegedly unequal employment practices of the defendants, necessarily raises common questions of law and fact. *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir. 1969); *see also, Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir. 1975); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir. 1975), cert. denied 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

■ The Intervenors challenged the propriety of certifying an industry-wide class in this action, questioning whether the claims of the named plaintiffs, all of whom are from the Modesto area and all of whom belong to one union local, are typical of the claims of cannery workers in other areas who are employed by different companies and belong to different unions. However, the Court finds that the claims of the named plaintiffs are sufficiently typical of the claims of other class members, especially in light of the industry-wide employment practices under the collective bargaining agreement and the industry-wide solutions proposed in the Agreement. The fact that there is not a named plaintiff for each plant or facility location is not controlling in these circumstances.

■ Courts have unhesitatingly certified classes composed of members in widely separated geographical areas. *Johnson v. Georgia Highway Express, Inc., supra; Wetzel v. Liberty Mutual Insurance Co., supra; Piva v. Xerox Corp.*, 70 F.R.D. 378 (N.D.Cal.1975); *Sagers v. Yellow Freight Systems, Inc.*, 58 F.R.D. 54 (N.D.Ga.1972). Moreover, courts have made clear that in the design of classes in employment discrimination suits, not every member of the class need be in a situation identical to that of the named plaintiffs. *Rich v. Martin Marietta Corp., supra.* Thus, it is not necessary that there be a named plaintiff adversely affected by each and every employment practice challenged in the complaint. *Dennison v. City Dept. of Water and Power*, 10 FEP Cases 1486 (C.D.Cal.1975).

The Intervenors also assert that an industry-wide class is defective because the named plaintiffs lack standing to act as class representatives in an action against defendant companies with which they have never had any type of employment relationship or against defendant union locals to which they never belonged.

In assessing this contention, it is important to remember that the typicality and commonality requirements of Rule 23 should be liberally applied in employment discrimination suits. *Piva v. Xerox Corp., supra.* The reason for this is that such suits enhance a broad public interest in enforcing fundamental constitutional principles as well as advancing the rights of the individual plaintiffs who bring the action. *Rich v. Martin Marietta Corp., supra,* 522 F.2d at 340. The Intervenors' reliance on *LaMar v. H. & B. Novelty and Loan Co.,* 489 F.2d 461 (9th Cir. 1973), *Kauffman v. Dreyfus Fund, Inc.,* 434 F.2d 727 (3d Cir. 1970), and *Chevalier v. Baird Savings Association,* 66 F.R.D. 105 (E.D.Pa.1973), is clearly misplaced. Those cases are not Title VII cases and, thus, cannot be deemed to be dispositive in the instant case.

The clear import of those cases precludes class-action treatment where a plaintiff who has a cause of action against a single defendant attempts to represent a class of persons who may have been injured by the actions of other, *unrelated* defendants who have engaged in conduct closely similar to that of the single defendant. In such circumstances, it is reasonable to conclude that the named plaintiff cannot represent those having causes of action against other defendants against whom the plaintiff has no cause of action and at whose hands he suffers no injury. *LaMar v. H. & B. Novelty and Loan Co., supra,* 489 F.2d at 462.

However, all of the defendants in this case operate under a single, industry-wide collective bargaining agreement. As noted, the crux of this suit revolves around the operation of this agreement. Thus, this is not a case where the named plaintiffs are attempting to assert a cause of action against *unrelated* defendants. Accordingly, the Court finds that where a group of employees and unions operate pursuant to a uniform collective bargaining agreement through industry-wide representatives, it is appropriate that the plaintiff class be defined to include all affected employees who work under that agreement. *See, e. g., Patterson v. Newspaper & Mail Del. U. of*

*N.Y. & Vic.,* 384 F.Supp. 585 (S.D.N.Y. 1974), *aff'd* 514 F.2d 767 (2d Cir. 1975); *see also, Salinas v. Roadway Express, Inc.,* 10 FEP Cases 1173 (W.D.Tex.1975); *Freeman v. Motor Convoy, Inc.,* 68 F.R.D. 196, 200 (N.D.Ga.1975).

If the Intervenors' contention were correct, there could never be an industry-wide lawsuit and reformation of discriminatory industry-wide collective bargaining agreements since essential parties would always be absent unless there existed a plaintiff with sufficient time and money to find representatives at each plant and of each local union of each class of employee allegedly discriminated against. Alternatively, individual suits against each separate cannery and union local would be required. The insistence on such a requirement would be wasteful and contrary to the preference of the courts and of the EEOC for industry-wide remedies in Title VII actions. *See, United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir. 1975).

The Court further finds that the named plaintiffs meet the requirements of adequate representation of Rule 23(a)(4). In making a determination as to the adequacy of representation, courts have looked to whether the interests of the class representatives are antagonistic to those of the class and whether counsel for the named plaintiffs possess the requisite ability and expertise to conduct the litigation. *Wetzel v. Liberty Mutual Insurance Co., supra,* 508 F.2d at 247.

The plaintiffs, along with all other class members, have an interest in alleviating the effects of the alleged employment discrimination in the canning industry. The named plaintiffs have been represented by experienced and competent counsel. The Court notes that the interests of the plaintiff class have been further protected by the participation of EEOC in the negotiations. The EEOC, through its Regional Director, has indicated its approval of the settlement.

In regard to adequacy of representation, the Court has also considered the fact that the parties to this settlement have provided for an "opt-out" procedure for potential

class members who do not wish to be bound by the terms of the settlement. This provision provides "minority and female employees the opportunity to make an informed and voluntary choice over whether [the settlement] is satisfactory to them". *United States v. Allegheny-Ludlum Industries, Inc., supra*, 517 F.2d at 864. This "opt-out" procedure strengthens the overall reasonableness of the settlement and further insures the adequacy of representation of the class interests by the named plaintiffs.

■ Furthermore, with regard to the requirements under Rule 23(b)(2), the Court finds that the defendants in this case, through the operation of the industry-wide collective bargaining agreement, have acted on grounds generally applicable to class members and thereby industry-wide injunctive relief affecting all class members is appropriate. Accordingly, I hereby certify this action as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure. *Cf. Wetzel v. Liberty Mutual Insurance Co., supra.*

I should also add that this action could also properly be certified under the requirements of Rule 23(b)(3) in that common questions of law and fact predominate over any individual questions and, for the reasons previously stated, an industry-wide class is superior to any other available method of litigating this case. Alternatively, I also certify this action as a class action under Rule 23(b)(3).

The Intervenors assert that the parties have violated the clear mandate of Section 1.46 of the Manual in negotiating a settlement prior to class certification. The Manual does warn that "care should be taken to avoid undesirable, premature, unauthorized settlement negotiations in class actions. Before any settlement negotiations, there should be a class action determination." The Manual also advises against the formation of tentative classes for the purposes of settlement, concluding that tentative classes for the purposes of settlement, with or without the provision that the members should be required or permitted to opt out

and litigate their claims for relief, should never be formed.

The Manual relies on the reasons set forth in *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971), in making these recommendations. There the court expressed concern that a person who negotiates as an unofficial class representative must be under strong pressure to conform to the defendant's wishes out of the fear that the defendant will negotiate with someone else if the unofficial representative proves recalcitrant. Other reasons cited in the Manual for disapproval of tentative settlement classes include (1) doubt about their propriety under Rule 23, (2) fears concerning inadequate representation, (3) lack of adequate information concerning the size of the class and the amount of potential damages, and (4) preemption of a party's choice to litigate individually or as a class member.

However, not all courts have followed the Manual's recommendations. Indeed, even in *Ace Heating*, the court refused to overturn the trial court's use of the tentative settlement class procedure, although the reviewing court did caution that a trial judge should be "doubly careful" in evaluating the fairness of such settlements. *Ace Heating & Plumbing Co. v. Crane Co., supra*, 453 F.2d at 33.

In *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 466 (2d Cir. 1974), the tentative settlement class procedure was also approved. The court called attention to the fact that the Manual contains recommendations, not intractable rules which should be followed blindly.

A commentator recently also opined that tentative settlement classes are appropriate in Title VII cases. Note, *The Tentative Settlement Class and Class Actions Under Title VII of the Civil Rights Act*, 72 Mich.L. Rev. 1462 (1974).

■ Moreover, the dangers of a tentative settlement class which underlie the Manual's disapproval are not present in the instant case. Here, the plaintiffs lost no "leverage" because they were not the certified representatives of an industry-wide

class because the defendants were the ones who insisted on an industry-wide settlement. The participation of the EEOC in the negotiations provided additional protection against a "sellout". Furthermore, the question of adequacy of representation was well litigated and subjected to close judicial scrutiny.

Accordingly, the Court finds that the use of the tentative settlement class procedure was appropriate in this case.

## IV. THE AGREEMENT

We turn now to an evaluation of the Agreement.

### A. The Scope of Review in Assessing the Agreement

The proposed settlement should be assessed in light of the principles discussed in the recent Fifth Circuit opinion in *United States v. Allegheny-Ludlum Industries, Inc., supra.* In this thoughtful and thorough opinion, Judge Thornberry outlined the rules of law which govern the review of a settlement, particularly in a Title VII case. The decision emphatically affirms the principle that "conciliation and voluntary settlement are the preferred means for resolving employment discrimination disputes". 517 F.2d at 846. Stated another way, "voluntary compliance is preferable to court action and * * * efforts should be made to resolve these employment rights by conciliation both before and after court action". 517 F.2d at 846.

These principles were affirmed mindful of the Supreme Court's recent pronouncements to the effect that Congress gave private individuals a significant role in the enforcement process of Title VII and that the final responsibility for enforcement of Title VII is vested with the federal courts. 517 F.2d at 848.

As for the general principle governing the approval of settlements, the task was aptly summarized by Judge Wyatt in *West Virginia v. Chas. Pfizer & Co.*, 314 F.Supp. 710, 740–41 (S.D.N.Y.1970), *aff'd* 440 F.2d 1079 (2d Cir. 1971), *cert. denied* 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971):

"Whether to approve a compromise involves an exercise of discretion. The Court is responsible for the protection of the many class members whose interests are involved but who do not appear in the action. Approval should be given if the settlement is fair, reasonable, and adequate. These terms are general and cannot be measured scientifically."

██ The most important factor to be considered is the strength of the plaintiff's case. Another important element in the equation is the estimated length, complexity, and expense of the litigation. However, the court should not endeavor to make a final determination of liability or damages. Nor should a court attempt to determine whether the proposed settlement is the best possible or even whether a better agreement might have been negotiated. As Judge Thornberry stated:

"The central issue here is not whether the consent decrees achieve some hypothetical standard constructed by imagining every benefit that might someday be obtained in contested litigation." *United States v. Allegheny-Ludlum Industries, Inc., supra*, 517 F.2d at 850.

Additional factors to be considered are the extent of discovery which was conducted and the opinion of counsel that the settlement should be approved. *Flinn v. FMC Corp.*, 528 F.2d 1169 (4th Cir. 1975). The approval of the EEOC is another important guide to the Court in its consideration. *Flinn v. FMC Corp., supra*.

### B. Structure of the Canning Industry

In order to understand the terms of the proposed settlement now before the Court for approval, and in order to gauge the propriety of maintaining this action as a class action, it is necessary to outline briefly the nature of the canning industry.

As noted, CPI and the State Council have been parties to an industry-wide collective bargaining agreement for many years. The most recent agreement covered some 57,000 workers in 74 separate facilities throughout Northern California. The canning industry operates on a seasonal basis. During the

peak harvest season for fruits and vegetables processed by the defendants, June-October, as many as 60,000 people are employed.

Virtually all bargaining unit jobs are functioning during the peak of the processing season. After the season, however, many bargaining unit jobs do not operate, as they are directly associated with the processing of fruits and vegetables. Some jobs do continue for a time after the season, and a lesser number continue virtually all year-round. Thus, during the down-season, employment drops to some 4,000 to 15,000 persons per month. Females are estimated to constitute some 58% of the present peak-season work force; the percentage of minority workers in the peak-season work force is estimated at 62%.

Cannery jobs are rated and paid commensurate with the skills required. Each job is designed by bracket number, with IA being the highest and V the lowest. Jobs in brackets III and above are referred to as "high-bracket" jobs. Approximately 11,000 jobs in the industry are high-bracket jobs. Advancement to higher brackets is based on a posting and seniority system. Job openings are posted and individuals bid for them. The individual with the highest seniority and the qualifications to perform the job is awarded the job.

An employee's ability to secure a job which continues after the processing season, many of which are high-bracket jobs, depends in part on the employee's seniority relative to others who seek the job. The more senior employees have an opportunity to "bump" less senior persons out of such job opportunities. Workers who successfully withstand layoffs and thereby work more than 1,400 hours a year are called "regulars"; those persons employed for less than 1,400 hours a year are called "seasonals". Regular workers have better fringe benefits than seasonals. They also enjoy a guaranteed pay rate, unlike seasonal workers.

Until 1973, the collective bargaining agreement created two seniority lists. One list contained the names of all regular employees, that is, those who had worked for 1,400 hours during a one-year period. Most of those listed on the regular list were males. Employees who worked more than 30 days but less than 1,400 hours during the year were placed on the "seasonal" seniority list. Virtually all persons on the seasonal list were females. Under the provisions of the collective bargaining agreement which existed prior to 1973, 1,400-hour employees had greater seniority than non-1,400-hour employees. In 1973, the collective bargaining agreement was modified so that the seniority lists were merged, with the 1,400-hour employees placed above the non-1,400-hour employees on the single seniority list. New employees, regardless of their status, were placed at the bottom of the combined list in order of hire.

Thus, in regard to relative seniority, seasonal employees were clearly disadvantaged when compared with regular employees. A related seniority disadvantage suffered by seasonal workers existed in regard to those employees who sought high-bracket jobs (Bracket III and above) during the processing season. Employees on the 1,400-hour list would have had more seniority on which to base a bid into a job in a high bracket during the processing season.

The central allegation of discrimination in this action is that females and minority group members have been denied opportunities to obtain high-bracket and regular (year-round) positions within the industry. The main thrust of plaintiffs' attack is directed at the dual seniority system, created and enforced by the collective bargaining agreement, and institutionalized in 1973 through the "grandfathering" of the regular employee seniority list over the seasonal list. Plaintiffs charge that the functioning and administration of the seniority system is the basic cause of the alleged disparate treatment between Anglo males, on the one hand, and females and minority group employees on the other hand.

## C. Terms of the Agreement

The essential elements of the Agreement include the following:

### 1. *Affirmative Action Obligations*

The Agreement creates a one-for-one job placement formula for women and minorities in both high-bracket job vacancies and mechanic vacancies until the goals prescribed in the Agreement are met and maintained for each high bracket. The goals for high-bracket jobs are: for women, 30% of the jobs in each high bracket; for minorities, the percentage of the jobs in each high bracket must equal that minority group's percentage of the population in the county where the plant is located. The goals for mechanics are the same as high-bracket job goals for minorities; for women, the goal is 20% of the mechanic jobs in each high bracket.

Under the Agreement, women and minorities will not be prevented from bidding for the nonpreference slots. They will bid based on plant seniority as described below.

In order to facilitate women and minority advancement in high-bracket jobs, the defendants will give off-season training to minorities and women based on the number of anticipated vacancies in the high-bracket positions. The training for each employee will be of three-weeks duration and may involve up to three jobs. Employees who complete this training will be considered qualified for the job. During training, employees shall receive their regular rate of pay.

A training program for prospective mechanics of approximately one year in duration is also created under the Agreement.

The parties estimate that 1,800 to 2,200 vacancies in high-bracket and mechanic jobs will occur each year throughout the industry. In order to encourage women and minority-group employees to bid on and retain high-bracket jobs until the goals are met and maintained, women and minority-group employees attaining high-bracket jobs and working 500 hours will receive promotion incentives of $150. After working another 500 hours in a high-bracket job, they will receive an additional $150.

Moreover, the Agreement provides for the elimination of the "incumbency rule", a tacit understanding under which the holder of a job in the previous season supposedly got preference for that position upon recall at the beginning of the peak season, regardless of seniority. Such a rule would have had the effect of acting as a barrier to upward mobility of women and minorities into high-bracket positions.

### 2. *Revising the Seniority Lists—Plant Seniority*

The ability of a worker to move into high-bracket and regular jobs depends in large part upon seniority. Up to now, seasonal workers had relatively low seniority because, when the seniority lists were merged, all the seasonal workers were placed below the regular workers in terms of seniority. This put the seasonal workers, most of whom were women, at a serious disadvantage in bidding for high-bracket jobs.

The Agreement addresses this problem by introducing the concept of plant seniority. Under the Agreement, whenever a woman or minority attains a high-bracket or mechanic job, that person moves up on the seniority list for layoff and recall purposes, and fringe-benefit calculations, based on his or her earliest seniority date, that is, the earlier of the date of that person's hiring on either the 1,400-hour seniority list or the non-1,400-hour seniority list. In addition, all women and minorities who have attained a high-bracket or mechanic job since July 2, 1965, move up on the seniority list in the same manner. Moreover, under the Agreement women and minorities will be entitled to use plant seniority in bidding to attain the high-bracket or mechanic jobs.

The Agreement makes it clear that all jobs are open for claiming at the beginning of the canning season and that class members may use plant seniority in bidding to attain these jobs. Prior to the beginning of each season, all positions, including regular and mechanic positions, will be "racked up" and posted. Positions to which persons having worked the previous season intend to return are subject to claim by class members on the basis of plant seniority and

qualifications. Positions on the "rack up" that are open because the previous season's holder has not returned are considered "vacant". Class members may bid on such vacancies on the basis of plant seniority and qualifications and, as to such openings, the Agreement guarantees that one of every two vacancies is to be filled by a class member. Vacancies occurring during the season are also subject to the one-for-one rule. Work force adjustments occurring during the season are governed by contractual seniority. However, the ability of class members to withstand layoffs is enhanced by the attachment of plant seniority for layoff and other purposes upon attainment of a high-bracket or mechanic position.

The introduction of plant seniority, together with the promotional preference described above, will substantially increase the opportunity for women and minorities to bid on and attain jobs of their choice in the canneries. Statistical projections introduced at the hearing indicate that women are expected to occupy 50% of the high-bracket jobs and 25% of the mechanic positions in the industry after five years. Minorities are projected to hold approximately 61% of the high-bracket jobs. Thus, it is projected that at the end of the five-year term of the Agreement, over 80% of the high-bracket jobs in the canning industry will be held by class members.

These provisions of the Agreement are designed to place class members in the employment status which they would have occupied but for the alleged discrimination of the defendants, and thus gain for such class members their "rightful place" within the cannery work force. Cf. *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *United States v. Navajo Freight Lines, Inc.*, 525 F.2d 1318 (9th Cir. 1975); *Gamble v. Birmingham Southern R.R. Co.*, 514 F.2d 678 (5th Cir. 1975).

### 3. *Compensating Victims of Past Discrimination*

An Affirmative Action Fund (the Fund) will be established, funded by contributions by the defendant companies based on three cents per hour worked by each bargaining unit employee. About $5 million will be paid into the Fund over the five-year life of the Agreement.

The Fund will be managed by four trustees, two appointed by the canneries and two appointed by the unions. A two-member Conformance Committee is also created, composed of one representative of the EEOC and one representative of the Mexican-American Legal Defense and Educational Fund (MALDEF), counsel for the plaintiffs. Each decision of the Board of Trustees concerning disbursements from the Fund is subject to Conformance Committee approval.

The first call on the Fund in an amount up to $4.9 million is to compensate employees for past discrimination. All class members have the right to file discrimination charges for back pay and other relief. The defendants will distribute EEOC discrimination charge forms to class members. These charges will be conciliated by the EEOC. If not disposed of in this fashion, the matters will go before a special master appointed by the Court. The Fund will compensate individuals for such back-pay claims as are determined appropriate by the master.

Any awards that result from future invidious conduct of the defendant companies are *not* compensable from the Fund. They will be paid by the individual company or union involved.

The Fund will also pay for the incentive payments provided to women and minority workers who retain high-bracket jobs for more than 500 hours up to a limit of $1 million. It will also fund the training programs created under the settlement.

### 4. *Enforcement, Monitoring, and Reporting*

To implement the Agreement and oversee the entire industry-wide affirmative action effort, an Office of Affirmative Action is created by the Agreement.

The Agreement also established expedited dispute resolution procedures for all charges and complaints concerning the subject matter of the Agreement. A recent modification of the Agreement provides that a class member will serve as a liaison person in each plant to facilitate the investigation of any disputes.

Additionally, the Agreement calls for reporting by both the canneries and the unions as to matters concerning the achievement of the goals and objectives of the Agreement. It further provides for the monitoring of the defendants' compliance by the EEOC and MALDEF. Moreover, the Court retains jurisdiction of the action for the purpose of enforcing the terms of the Agreement.

### 5. *Obligations of the Unions*

Finally, the Agreement imposes upon the defendant unions and the State Council the obligation to hire and maintain minority and female employees in union staff positions in the same proportion as their representation in the work force. It also obligates the unions to furnish translations of certain documents, including the collective bargaining agreement, to its members.

### D. *Objections to the Agreement*

█ Intervenors have raised objections to specific terms of the Agreement and have challenged its overall adequacy. Their objections are largely ones of degree, for the Agreement addresses each of the specific problems they raise.[3] Of course, the Agreement should be approved if it is fair, reasonable, and adequate, if it presents a reasonable compromise taking into account the many factors and variables which enter into a case such as this. Even vigorous opposition to the settlement, or objection by a large number of class members does not render a settlement unreasonable. *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799, 863 (3d Cir. 1974), *cert. denied* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). Here, objectors amounted to a small fraction of one percent of the class.

The Intervenors first question whether the provisions of the Agreement introducing the plant seniority concept are sufficient to afford class members their "right-

---

**3.** A number of objections originally raised by the Intervenors have been mooted by modifications in the Agreement incorporated during the course of the proceedings. Among the modifications and clarifications to the Agreement pertinent in this regard are the following:

(1) A clarification of the definition of "plant seniority" to make it clear that every class member may use plant seniority in *bidding* for all high-bracket jobs during the term of the Agreement. Without this clarification, the Agreement appeared to provide for the attachment of plant seniority only *after* a class member had attained a high-bracket job.

(2) A revision calling for the elimination of the "incumbency rule" in all high brackets. As originally proposed, the Agreement only specifically provided for the abolition of the "incumbency rule" in Bracket IV jobs, the second lowest of the eight contract pay brackets.

(3) The inclusion of a specific provision requiring the defendant employers to post notices of all high-bracket jobs which become available at the beginning of each processing season, and to accept applications for these jobs from class members.

(4) A clarification indicating that as much as $4.9 million of the Fund would be availa-

ble for payment of back-pay claims, and a commitment from the defendant employers that they intended to fulfill the affirmative action and training obligations under the Agreement even if more than $5 million were required to carry them out.

(5) A clarification insuring that the promotion goals established in the Agreement applied to *each* high bracket.

(6) The expansion of the class of persons eligible to obtain the benefits of plant seniority to include those class members who have attained high-bracket jobs from July 2, 1965, as well as those who attain a high-bracket job during the life of the Agreement.

(7) The expansion of the duties of the Conformance Committee to include the explicit right to contest the discharge of the Director of Affirmative Action.

(8) The inclusion of a provision calling for the appointment of a class member representative in every cannery by the Director of Affirmative Action to act as a liaison in the dispute resolution process and to investigate and make recommendations regarding disputes.

(9) The undertaking by the defendant unions to provide their members with translations of pertinent documents, including the collective bargaining agreement.

ful place" in the cannery work force.[4] Intervenors point out that under the Agreement plant seniority may be used for bidding on high-bracket jobs, but cannot be asserted for layoff, recall, or shift assignment until and unless the class member first obtains a high-bracket job. The Intervenors assert that the Agreement should provide for the immediate utilization of plant seniority by class members for all purposes.

However, the Intervenors' proposal for across-the-board plant seniority ignores the seasonal nature of the industry and the fact that under the collective bargaining agreement, an employee who refuses to do available work for which he or she has the seniority and qualifications suffers a complete loss of seniority. Thus, if plant seniority were immediately granted to class members for all purposes, large numbers of seasonal workers would be placed in line for regular jobs continuing after the season and would be required to accept such employment or lose seniority rights.

Evidence introduced at the hearing suggests that many seasonal employees do not desire year-round employment. The plant seniority concept developed by the Proponents of the Agreement was fashioned with this fact in mind. Therefore, class members desiring to work year-round may use plant seniority for bidding purposes, while those who wish to experience a layoff at the end of the peak season are not penalized for failing to accept available work. Such an accommodation reflects the realities of the canning industry while still fostering the employment goals of Title VII.

Moreover, in assessing the Intervenor's charge in this regard, Judge Thornberry's opinion in *United States v. Allegheny-Ludlum Industries, Inc., supra,* is again pertinent:

> "Next, to the extent that the settlement may in occasional respects arguably fall short of immediately achieving for each affected discriminatee his or her 'rightful place,' we must balance the affirmative action objectives of Title VII and Executive Order 11246 against the equally strong congressional policy favoring voluntary compliance. The appropriateness of such balancing is especially clear, as here, 'in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals.'" 517 F.2d at 850.

The Intervenors also question the propriety of granting plant seniority only to class members and not to all members of the

---

4. The Intervenors and the Proponents essentially agree on the legal standard currently adopted by courts in assessing affirmative action programs which attempt to remedy the effects of past discrimination in seniority and promotion. The test, first formulated by the Fifth Circuit, is called the "rightful place" theory. In *Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States,* 416 F.2d 980 (5th Cir. 1969), *cert. denied* 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970), the court invalidated a seniority system which gave priority to workers who had worked the longest in the job slot below the vacancy where present seniority had been carried over from a time when progression lines had been segregated. The court held that this system violated Title VII since it tended to perpetuate the effects of past discrimination.

The court endorsed a "rightful-place" system whereby progression continued to be on a job-by-job basis, but seniority was determined by time at the mill rather than time in the job slot below the vacancy. In construing Title VII, the court stated:

"The Act should be construed to prohibit the *future awarding* of vacant jobs on the basis of a seniority system that 'locks in' prior racial classification. White incumbent workers should not be bumped out of their *present* positions by Negroes with greater plant seniority; plant seniority should be asserted only with respect to new job openings." 416 F.2d at 988.

The "rightful place" test has been reaffirmed in more recent decisions regarding the revamping of seniority and progression lines. *See, e. g., United States v. Navajo Freight Lines, Inc.,* 525 F.2d 1318 (9th Cir. 1975); *EEOC v. Detroit Edison Co.,* 515 F.2d 301 (6th Cir. 1975); *Gamble v. Birmingham Southern R.R. Co.,* 514 F.2d 678 (5th Cir. 1975).

The Supreme Court recently expressed its view that the adjustment of seniority rights in accord with the "rightful place" theory is consistent with the "make-whole" remedies intended by Congress to effectuate Title VII. *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

work force. The Intervenors suggest that class members will thereby gain an unfair advantage (seniority based on first date as seasonal) over regular, nonclass member employees, whose seniority will remain fixed at the date they first moved onto the regular seniority list. They argue that such a proposal would grant class members more than their "rightful place" in contravention of the recent Ninth Circuit decision in *United States v. Navajo Freight Lines, Inc., supra.*

However, Intervenors' reliance upon *Navajo Freight* is plainly misplaced. There, the employer maintained separate seniority lists for local drivers and over-the-road drivers. Minorities in local driving positions who wished to transfer to over-the-road positions had to forfeit their total accumulated local seniority and start as new employees in the over-the-road classification. To remedy the discrimination found in that case, the court's decree provided that local drivers could carry their company local seniority when they transferred to over-the-road positions. As noted by the Ninth Circuit:

> "This Order [the District Court's order] did not displace any non-minority road driver from his existing position. It merely established an orderly method by which members of the discriminatee class could apply and qualify for road driver positions 'when vacancies occur.'" 525 F.2d at 1318.

The Agreement here does precisely the same as the district court order in the *Navajo Freight* case. Females and minority group employees who bid on high-bracket jobs will carry with them their full accumulated seniority and use that seniority to bid on other jobs which will enable them to work year-round.

In *Navajo Freight*, the court went on to say that only those measures which require discharge of incumbents or are contrary to the dictates of "business necessity" are forbidden in the fashioning of remedies to afford discriminatees their "rightful place". 525 F.2d at 1326.

Nothing in the Agreement allows class members to "bump" nonclass incumbents from preferred positions. Such a measure might well run afoul of Title VII. *Patterson v. American Tobacco Co.*, 535 F.2d 257 (4th Cir. 1976). Even though the Agreement provides that all positions are open for claiming at the beginning of the season, and that class members may utilize plant seniority in bidding for these positions, such openings are not secured jobs from which nonclass incumbents are wrenched by the readjustment of seniority.

Any suggestion that Title VII forbids the award of retroactive seniority to class members which will conflict with the seniority expectations of nonclass members was recently put to rest by the Supreme Court in *Franks v. Bowman Transportation Co., supra.* There, the Court stated:

> "* * * it is apparent that denial of seniority relief to identifiable victims of racial discrimination on the sole ground that such relief diminishes the expectations of other, arguably innocent, employees would if applied generally frustrate the central 'make-whole' objective of Title VII. These conflicting interests of other employees will of course always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy. But, as we have said, there is nothing in the language of Title VII, or in its legislative history, to show that Congress intended generally to bar this form of relief to victims of illegal discrimination * * *. Accordingly, we find untenable the conclusion that this form of relief may be denied merely because the interests of other employees may thereby be affected. 'If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed.'" 424 U.S. at 774, 96 S.Ct. at 1269.

The Intervenors also argue that the Agreement does not adequately advance

the interests of women in attaining high-bracket, mechanic, and year-round positions. The effects of the promotional goals set for women in high-bracket and mechanic jobs during the five-year effective period of the Agreement have been set forth in statistical projections introduced at the hearing and supported by evidence. The projections show that the total effect of the promotional goals, the one-for-one promotional preference for women, and the reconstruction of the seniority lists through implementation of the plant seniority system plus other provisions of the Agreement will result in women holding approximately twice the number of high-bracket and mechanic jobs presently held by women, if they are interested in doing so. Thus, it is estimated that women will occupy at least 50% of the high-bracket jobs and 25% of the mechanic positions at the end of the term of the Agreement. These figures demonstrate that significant steps will be taken under the Agreement to improve the level of participation of women in the high-bracket and mechanic jobs.

The Intervenors argued that the movement of women into high-bracket jobs will result in a reduction in the number of minority men holding those jobs at the end of the five-year term of the Agreement. However, this prediction regarding the loss of jobs by minority males was based upon questionable hypotheses. It also fails to take into account that minority males will have the benefit of using their plant seniority to claim and retain high-bracket jobs. Even if there were to be a reduction in the number of minority males in those jobs, and there is considerable expert opinion that that will not in fact occur, it is clear that the effect on minority men will be small compared to the effect on Anglo men. In any event, minorities will still hold a high proportion of these jobs compared to either their percentage in the county population or the plant work force.

■ Intervenors claim that the utilization of parity with county labor force statistics as the goal for minority participation in high-bracket and mechanic jobs is improper.

They suggest that a standard of plant or work-force parity, that is, parity with the percentage of minorities working in each plant, be adopted. In fact, because each high bracket must be at parity before the goal is met, the results of the promotional preference contained in the Agreement will approximate work-force parity. The goals set by the Agreement which, it must be remembered, is the product of a settlement, are reasonable ones consistent with the objectives of Title VII. Relevant prior decisions and available governmental guidelines have approved the use of Standard Metropolitan Statistical Area (SMSA) or county population figures as the appropriate affirmative action goals. *See, e. g., Legal Aid Society of Alameda County v. Brennan,* 381 F.Supp. 125 (N.D.Cal.1974); Executive Order No. 4 (41 C.F.R. § 60–2); OFCC Technical Guidance Memo No. 1. *See also, Reed v. Lucas,* 11 FEP Cases 153 (E.D.Mich.1975); *Boston Chapter NAACP, Inc. v. Beecher,* 504 F.2d 1017, 1026–1027 (1st Cir. 1974), *cert. denied* 421 U.S. 910, 95 S.Ct. 1561, 43 L.Ed.2d 775 (1975). Although work-force parity might well be appropriate if the case proceeded to a litigated outcome, the Court finds no reason for insisting upon such a goal in this settlement. Nor does the Court find that the utilization of county-parity goals rather than work-force parity renders the Agreement unjust, unreasonable, or inadequate.

The Intervenors also challenge the adequacy of the Fund available to compensate victims of defendants' past discrimination and the procedures which must be followed by class members to assert a back-pay claim. As noted earlier, the first call on the Fund, up to an amount of $4.9 million, is to provide monetary relief to those asserting back-pay claims. To be eligible to recover back pay, a class member is required to file a discrimination charge form with the EEOC. In view of this requirement, the defendants have agreed to mail a blank form to every possible class member and have stipulated that a class member may submit the charge form, as a claim for back pay within 180 days of the effective date of the Agreement.

The attorneys for the plaintiff class and the EEOC have estimated the number of meritorious discrimination charges which will be made by the class and the ultimate dollar value of those charges, taking into account, among other factors, the questions of proof and method of computation of the amount of back pay to which the employee is entitled.

There was considerable dispute as to amounts of back pay to which an average class member would be entitled, with estimates ranging from several hundreds to many thousands of dollars. However, in light of the size of the available fund and the small number of discrimination charges which have hitherto been filed by class members, the Court is satisfied that the Fund provides a reasonable pool from which to draw back-pay claims. Moreover, the Court finds that the procedures established under the Agreement to assert back-pay claims are not unnecessarily burdensome. The Court also rejects the Intervenors' contention that the Agreement is defective because only the employers and not the unions contribute to the Fund. The Court is not persuaded that the absence of union contributions to the Fund here renders the Agreement unfair or in any way affects the interests of the class.

The Intervenors also disagree with the training aspects of the settlement. They argue that no jobs other than mechanic jobs require anything more than minimal on-the-job training, but there is no credible evidence in support of their claims. The Proponents have not argued that extensive off-season training is needed for *all* high-bracket jobs, but only for certain jobs which can lead to regular status. There is ample evidence showing the need for off-season training in these particular high-bracket jobs. With regard to mechanic training, the evidence is clear that the hectic pace in the plant during the processing season prevents effective on-the-job training at least for the initial stages of such training. Moreover, the off-season paid training under the settlement constitutes a substantial monetary benefit to class members, since

class members will be paid during the time they are receiving training.

In addition, the Intervenors claim that the grievance arbitration procedures have been administered in a discriminatory fashion by the local unions and the State Council and that the Agreement did nothing to remedy the situation. No such discrimination was found.

Furthermore, that part of the settlement which calls for class members to be appointed business agents and shop stewards proportional to their membership in the union is a highly innovative device which will insure that class members at the plant will take their complaints to the grievance procedure.

A challenge has also been raised to the monitoring and enforcement procedures of the Agreement. There was substantial evidence, however, showing that the enforcement procedures in the settlement are unique and extremely beneficial to class members. In addition to the expedited EEOC procedures, class members have the option of an informal dispute resolution procedure conducted by the Director of Affirmative Action and the Director's liaison in the plant and a summary court procedure. Even the expert witness of the Intervenors testified that these procedures were far better than those ordinarily available to charging parties. He also stated that he did not know of any other lawsuit litigated or settled which had such far reaching enforcement mechanisms. Added to the individual's enforcement rights are the rights of the EEOC and MALDEF to sit on the Conformance Committee and to acquire knowledge of the employment practices of the plants through the reporting provisions. The Court finds that these monitoring and enforcement procedures are adequate to ensure the prompt and effective implementation of the Agreement, and to provide for prompt review of charged violations during the term of the Agreement.

Finally, the Intervenors claim that the establishment of the Fund violates provisions of federal labor laws prohibiting cer-

tain employer contributions to unions. They contend that the Fund, fully funded by the defendant companies and administered by a Board of Trustees composed of two trustees selected by the employers and two by the unions, violates Sections 302(a) and (b) of the Labor Management Relations Act of 1947. 29 U.S.C. § 186(a) and (b). These sections prohibit an employer from paying, lending, or delivering money to a labor organization except in certain defined circumstances. 29 U.S.C. § 186. They assert that these provisions will be violated because the Fund will be used to pay backpay claims resulting in part from the discriminatory practices of the defendant unions, and they argue that this, in effect, results in the assumption by the employer of potential liabilities of the unions in violation of the Act.

▪ The Court disagrees. At the outset, it should be noted that the Congressional intent behind the enactment of Section 302 was to prevent bribery by employers and extortion by union representatives, and to prevent any possible abuse of power by union officials if trust funds were left to their sole control. *Arroyo v. United States*, 359 U.S. 419, 424–427, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959).

The Fund, to be administered by a Board of Trustees composed of company and union representatives whose actions are challengable by an independent Conformance Committee, is certainly not within the sole control of the unions. Nor can the establishment of the Fund be construed to be the type of "bribe" or payment forbidden by Section 302. The Act was designed to prevent specific problems peculiar to the collective bargaining process; it was not intended to block any cooperative effort between union and management relating to remedying the effects of alleged discrimination in employment practices.

Moreover, the Fund falls squarely within the exception to Section 302 permitting employers to contribute to trust funds "established * * * for the purpose * * * of defraying the costs of apprenticeship or other training programs * * *". 29 U.S.C. § 186(c)(6). *In re Trustees of Operating Engineers, Etc.*, 303 F.Supp. 1126 (N.D.Cal.1969), is controlling in this regard. In that case, the court held that the establishment of an affirmative action and apprenticeship training fund similar in purpose to the Fund herein did not violate Section 302 although it was financed by employer contributions since the fund fell within the above-described exception.

▪ The Intervenors' contention that the establishment of the Fund violates Section 8(a)(2) of the Labor Management Relations Act of 1947 (29 U.S.C. § 158(a)(2)) is also without merit. This section makes it an unfair labor practice for an employer to contribute financial support to a labor organization. It has been construed to proscribe attempts by an employer to dominate, interfere with, or promote a union. *See, e. g., NLRB v. Thompson Ramo Wooldridge, Inc.*, 305 F.2d 807 (7th Cir. 1962); *NLRB v. Wagner Iron Works*, 220 F.2d 126 (7th Cir. 1955). However, where as here, the independence of a labor organization is not threatened by the actions of the employer, Section 8(a)(2) is not violated. This section does not prohibit all cooperation between a company and a union; it only prohibits attempts to dominate the union. *See, Chicago Rawhide Manufacturing Co. v. NLRB*, 221 F.2d 165 (7th Cir. 1955). The establishment and operation of the Fund will in no way infringe upon the union independence vis-a-vis their collective bargaining relationship with the cannery employers.

### E. *Conclusion*

▪ In evaluating the Agreement, this Court must take into account the likely rewards of litigation. *Cf. Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Evidence adduced at the hearing indicates that the plaintiffs would have had difficulty at a trial on the merits establishing a *prima facie* case of discrimination at least in regard to the claims of minority males. Difficulties of proof would also

have arisen with regard to individual claims of back-pay liability. Thus, it can be fairly said that plaintiffs' case was not entirely free from doubt, and a prediction of the ultimate litigated outcome would be speculative at best.

There are, obviously, many other possible means to redress alleged employment discrimination which could have been discussed, negotiated, and possibly included in the Agreement. A suit of this type addresses a complex of plant procedures, hiring, promotion, layoff, and recall rules and regulations. The industry involved in this case undoubtedly has a more volatile and fluctuating employment pattern than most. What this Court must decide is whether the provisions of this settlement amount to a fair, reasonable, and adequate voluntary resolution of the issues raised by the plaintiffs.

■■■ Having reviewed the evidence, heard the opinions of the expert witnesses, and studied the Agreement as modified and amended, I now find and determine that the Agreement is a fair, reasonable, and adequate resolution of this case.

The central allegation of discrimination in this action is that females and minority group members have been denied opportunities to obtain high-bracket and year-round positions within the canning industry. I am convinced that the Agreement provides a fair and reasonable solution to this claimed discrimination by restructuring the seniority, bidding, and training provisions under the collective bargaining agreement. The Agreement also establishes hiring preferences and goals to insure that the basic objective of opening up high-bracket and year-round positions for females and minorities is achieved. The Agreement further provides monetary relief to compensate the victims of past discrimination as well as to pay for future affirmative action obligations. I am also satisfied that the enforcement, reporting, and monitoring provisions of the Agreement are adequate.

I have thoroughly examined the objections to the Agreement raised by the Intervenors and others. However, I am not per-

suaded that any of the asserted defects, either singularly or taken as a whole, destroy the fairness, reasonableness, and adequacy of the settlement. I believe that the Agreement represents a great step forward for female and minority workers in the canning industry, and I feel that the plaintiff class should be afforded the immediate benefits of the Agreement rather than await the uncertain results of a litigated outcome several years from now. While other, and perhaps better, results might have been obtained after years of litigation, I am satisfied that the Agreement is one which effectuates and implements the remedial purposes of Title VII. Accordingly, the Court hereby approves the Agreement as amended and modified by the parties. The Court retains jurisdiction of this action for the purpose of monitoring the implementation of the terms of the Agreement.

## V. DENIAL OF MOTIONS FOR INTERVENTION

There remain the pending motions to intervene in the instant suit filed on April 28 and June 13, 1975.

The Intervenors claim entitlement to intervene in this suit as a matter of right under the provisions of Rule 24(a)(2) of the Federal Rules of Civil Procedure. This section authorizes intervention as a right when (1) the applicant claims an interest in the property or transaction which is the subject of the action, and (2) he is so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest, unless (3) the applicant's interest is adequately represented by existing parties.

Earlier, I granted the Intervenors limited rights of intervention for the purpose of fully participating in the hearing on the approval of the Agreement. This included discovery rights to enable them to gather information relevant to the proposed Agreement and to fully present their arguments in opposition to the settlement. *See, United States v. Allegheny-Ludlum Industries, Inc., supra,* 517 F.2d at 879; 3B J.

Moore, *Federal Practice*, ¶ 23–1441 and ¶ 23.90[2] at 23–1621–23–1623 (2d ed. 1975).

■ I now find that the Intervenors have *not* met the requirements for full intervention as a matter of right under Rule 24 of the Federal Rules of Civil Procedure. Although the Intervenors, as potential members of the class, undoubtedly may claim an interest in the subject matter of the action, I find that they are *not* so situated that the disposition of this action may, as a practical matter, impair or impede their ability to protect their interests.

I note that the Agreement allows any class member who does not wish to be bound by the terms of the Agreement to exclude themselves by opting out. Such persons, including the intervenors if they so desire, are not bound by the Agreement and may pursue their own remedies in this or any other appropriate forum. Especially in light of the ample opportunity that the Intervenors have had to express their opposition to the settlement, and to influence the fashioning of the Agreement, I am satisfied that the ability to opt out precludes the Intervenors from satisfying the impairment-of-interest test. *United States v. Allegheny-Ludlum Industries, Inc., supra*, 517 F.2d at 845.

The opportunity to participate in the fashioning of the final Agreement afforded the Intervenors through these proceedings distinguishes *Johnson v. San Francisco Unified School District*, 500 F.2d 349 (9th Cir. 1974).

Accordingly, the motions to intervene filed on April 28 and June 13, 1975 are hereby DENIED.